AO 91 (Rev. 11/11) Criminal Complaint                AUSA Timothy J. Storino (312) 353-5347

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

HISHAM ALKAHLA

CASE NUMBER: **MAGISTRATE JUDGE VALDEZ**

**14 CR 55**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 28, 2013, at Schiller Park, in the Northern District of Illinois, Eastern Division, defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a) | Possession with intent to distribute a mixture and substance containing a detectable amount of XLR 11, a form of synthetic cannabinoid, a Schedule I Controlled Substance. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

_20900_

LEO HAWKINS
Special Agent
Drug Enforcement Administration
(DEA)

Sworn to before me and signed in my presence.

Date: February 3, 2014

_____
*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*

**FILED**

FEB X 3 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | ss

## **AFFIDAVIT**

I, LEO HAWKINS, being duly sworn, state as follows:

1.    I am a Special Agent with the Drug Enforcement Administration, and have been so employed since 2010. My current responsibilities include the investigation of narcotics trafficking offenses.

2.    This affidavit is submitted in support of a criminal complaint alleging that HISHAM ALKAHLA has violated Title 21, United States Code, Section 841(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ALKAHLA with possession with intent to distribute a controlled substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.    The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

### **LEGAL BACKGROUND**

4.    "XLR 11" is a synthetic cannabinoid with the following chemical structure:

[1-(5-flouropentyl)-1H-indol-3-yl](2,2,3,3-tetramethylcyclo-propoyl)methanone. XLR

11 is a chemical that is processed and sprayed upon leafy, plant material, and the product is then commonly referred to as "K-2" or "Spice."

5.         Prior to May 16, 2013, XLR 11 constituted a "controlled substance analogue," pursuant to Title 21, United States Code, Section 813, if intended for human consumption.

6.         On May 16, 2013, DEA and the Attorney General temporarily scheduled.        [1-(5-flouropentyl)-1H-indol-3-yl](2,2,3,3-tetramethylcyclo-propoyl) methanone (5-fluoro-UR-144 or XLR 11), under the Controlled Substances Act  and pursuant to the temporary scheduling provisions of Title 21, United States Code, 811(h).  78 Fed. Reg. 28735.  The May 16, 2013, Order, thereby added XLR 11 to the list of controlled substances in Schedule I.  78 Fed. Reg. 28735.

## FACTS ESTABLISHING PROBABLE CAUSE

*Introduction to Investigation*

7.         In February 2013, DEA agents from the Chicago Field Division met with a confidential source ("CS1") in Chicago, Illinois.[1]  CS1 advised agents that he/she had been approached by a subject named "Hisham" (subsequently identified as Hisham ALKAHLA).   During an unrecorded meeting between

---

[1] CS1 has been cooperating with the DEA since February 2013.  CS1 originally provided third-party cooperation on behalf of a close relative in hopes of receiving favorable treatment for the close relative, who is awaiting sentencing on federal drug charges.  Since June 24, 2013, however, CS1 has been cooperating in exchange for monetary compensation only and no longer on behalf of the close relative.  DEA has paid approximately $475 to CS1 in relation to the instant case/investigation.  DEA has paid approximately $500 to CS1 in relation to another DEA case/investigation.  CS1's criminal history consists of two arrests for traffic-related offenses.   CS1 has no known criminal convictions.   The information provided by CS1 in connection with the instant investigation has been corroborated by DEA.

ALKAHLA and CS1, ALKAHLA informed CS1 that he was waiting for a sample shipment of synthetic drugs to arrive in the mail. ALKAHLA further advised CS1 that once it arrived, he (ALKAHLA) would provide CS1 with a sample. ALKAHLA gave his telephone number to CS1: xxx-xxx-7888. ALKAHLA advised CS1 that his source of supply was in Miami, Florida, and could provide hundreds of pounds of synthetic drugs.

8.     According to CS1, during an unrecorded telephone conversation between CS1 and ALKAHLA, CS1 informed ALKAHLA that he/she had a friend, subsequently identified as CS2,[2] who would be interested in purchasing large amounts of synthetic drugs.

9.     On or about February 22, 2013, CS1 received a text message from ALKAHLA from cellular telephone number xxx-xxx-7888. The text contained ALKAHLA's home address, which law enforcement subsequently confirmed as ALKAHLA's address through visual surveillance, where CS1 could meet him to pick up the sample of synthetic drugs, when it arrived.

_____

[2] CS2 has been cooperating with the DEA since November 2012. CS2 has been cooperating in exchange for monetary compensation. DEA has paid approximately $6,200 to CS2 in relation to the instant case/investigation. DEA has paid approximately $1,400 to CS2 in relation to another DEA case/investigation. CS2 also has cooperated with and received monetary compensation from other federal law enforcement agencies as well. CS2 first began cooperating with the FBI in 2005 after having been indicted for fraud. CS2 pled guilty pursuant to a plea agreement, which provides that government anticipates recommending a reduced sentence in exchange for CS2's full and truthful cooperation. CS2 has not been sentenced in that case. To date, CS2 has assisted law enforcement in a number of investigations and has testified in two different trials. CS2 has been paid for his services and expenses. In total, from 2006 through 2013, CS2 has been paid in excess of $280,000 for his cooperation with multiple federal law enforcement agencies in undercover investigations. CS2 has no known criminal convictions. The information provided by CS2 in connection with the instant investigation has been corroborated by DEA.

*March 7, 2013, Meeting between ALKAHLA, CS1, and CS2, and Seizure of*
*213 Grams of Then-Controlled Substance Analogue XLR 11*

10.     On or about March 7, 2013, at approximately 9:30 a.m., CS1 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888.[3]  During the conversation, CS1 advised that "[m]y guy," referring to CS2, could meet that day at approximately 2:00 p.m.  ALKAHLA and CS1 agreed to meet at a coffee shop near ALKAHLA's residence at approximately 2:00 p.m. in order for CS1 to introduce ALKAHLA to CS2.

11.     On or about March 7, 2013, at approximately 1:30 p.m., agents met with CS1 and CS2 at a predetermined staging location.  Agents searched CS1, CS2, and CS2's vehicle for weapons and contraband, none of which was found.

12.     At approximately 1:50 p.m., agents conducted surveillance of the CSs as they, driving in CS2's vehicle, traveled to and arrived at a coffee shop located on the 5000 block of North Cumberland Avenue in Norridge, Illinois.  ALKAHLA and the CSs previously agreed to meet there in order for ALKAHLA to meet CS2 and to provide free samples of synthetic drugs to them.

---

[3] Unless otherwise noted, all recorded telephone conversations and recorded in-person meetings were spoken predominantly in Arabic, with the parties sometimes speaking in English as well.  Following the telephone calls and meetings, the CS or CSs provided oral summaries of the content of the calls/meetings to law enforcement.  To date, a majority of the conversations and in-person meetings have been translated and transcribed by interpreters working with law enforcement; however, some audio-recorded meetings have not yet been transcribed.  Therefore, unless other indicated such as by "according to the CS(s)," the recitation of the conversations and meetings between ALKAHLA and the CSs are based upon translated transcriptions.

13. At approximately 2:00 p.m., surveillance observed the CSs meeting inside the coffee shop with a person subsequently identified as ALKAHLA. The meeting was audio-recorded.

14. CS2 asked ALKAHLA the brand name of the synthetic drug that he could obtain. ALKAHLA responded, "Different brand, different price." CS2 responded that the "formula" has changed, referring to the chemical structure of the synthetic drug, and that customers have complained that "it was not strong enough." ALKAHLA responded, "This is good," referring to the synthetic drug that he intended to distribute to the CSs.

15. CS2 inquired about the quantities, and whether the supplier could provide consistent quantities. ALKAHLA responded that he could provide a sample. ALKAHLA discussed how there are multiple types of brands, some brands more popular than others. ALKAHLA told CS2 that "[t]he price is according to quantity." CS2 stated that he/she wanted to buy "a big amount." ALKAHLA asked how much, offering to give him "a good price." CS2 then asked about the quality of the synthetic drug, and indicated that, according to CS1, ALKAHLA had a sample to provide to CS2. CS2 explained that, "[o]nce the quality is good, I'll tell you how much I want." ALKAHLA responded that the price was different depending on the source. For example, CS2 inquired about one source in Florida, and stated, "It's illegal in Florida. It's still illegal in Florida." ALKAHLA paused, and CS2 asked, "Or did they make it illegal?" ALKAHLA responded: "No, no. They didn't make it illegal. It's still available in Florida." ALKAHLA asserted, "It's legal."

16. ALKAHLA offered to give them a "special" or discounted price, and agreed to provide a sample to CS2. ALKAHLA advised that he has three or four suppliers, one of which is in Orlando and another in Louisiana. ALKAHLA and CS2 discussed how suppliers often "change their cooking all the time" and how popular synthetic drugs are in Europe.

17. At approximately 2:30 p.m., surveillance observed CS1 and CS2 exit the coffee shop with ALKAHLA. CS2 returned to his/her vehicle. Surveillance observed CS1 and ALKAHLA walk to ALKAHLA's vehicle, described as silver Toyota Tundra, bearing Indiana Dealer license plate "33928B." Once there, surveillance observed ALKAHLA retrieve a black bag from the driver side door of the Toyota Tundra. ALKAHLA handed the same black bag to CS1. CS2 picked up CS1 at ALKAHLA's vehicle, and the CSs departed together in CS2's vehicle.

18. After the meeting between the CSs and ALKAHLA, law enforcement surveilled the CSs as they traveled to a predetermined meeting location, at which agents recovered the black bag that ALKAHLA retrieved from his vehicle and gave to CS1. Federal agents opened the black bag and recovered a brown bag containing 33 packages of different brands of suspect synthetic drugs. Agents searched CS1, CS2, and CS2's vehicle for additional contraband and weapons, none of which was found.

19. The DEA laboratory determined that the suspect synthetic drugs ALKAHLA provided to the CSs on or about March 7, 2013 contained an approximate total net weight of 213 grams of XLR 11, which was then a controlled

substance analogue. The synthetic drugs also contained Dimethyl Sulfone (also known as "DMSO2" or "MSM"), a methamphetamine cut sometimes seen in heroin or cocaine.

*March and April 2013, Consensually-Recorded Telephone Calls*
*Between ALKAHLA and CS2*

20. On or about March 12, 2013, CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. CS2 advised that he had spoken with CS1, and stated that he/she (CS2) knew that ALKAHLA had called CS1 regarding their proposed business. CS2 stated that he liked "the merchandise that [ALKAHLA] gave [him] big time," and that they (CS2 and ALKAHLA) would set up a meeting for the following week.

21. On or about March 18, 2013, CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. CS2 advised ALKAHLA that he had been sick the past few days and needed a few more days to finalize their business. CS2 stated that he wanted to meet in person to discuss "prices and stuff, especially for the large packages." CS2 clarified that he wanted to purchase "large packages" because he "send[s] [them] to other states."

22. On or about April 1, 2013, CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. CS2 stated that he intended to place a "small order" for a "few thousand dollars, to see if everything's going to be fine." Following that initial order, CS2 stated that he intended to "deal" with ALKAHLA regularly "big time."

23.     On or about April 10, 2013, CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. CS2 stated that he wanted an order for next week for a "few thousand dollars." ALKAHLA agreed that he would wait for CS2 until Tuesday or Wednesday of the next week. CS2 asked if ALKAHLA had the "merchandise." ALKAHLA said he did not have it, but that it would take three to four days to obtain it.

*April 23, 2013, Meeting between ALKAHLA, CS1, and CS2*

24.     On or about April 22, 2013, CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. CS2 and ALKAHLA agreed to meet the next day at approximately 1:00 p.m. CS2 repeated his plan to buy a "small order" and reach an agreement on "pricing and everything." ALKAHLA responded, "God willing." CS2 also agreed to buy exclusively from ALKAHLA. CS2 agreed to call ALKAHLA before the meeting. Later that same day, CS2 placed another consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888, and they agreed to meet "in the south" at a coffee shop near 55th Street and LaGrange Road.

25.     On or about April 23, 2013, at approximately 12:00 p.m., agents met with CS1 and CS2 at a predetermined location. Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found. Agents surveilled the CSs as they traveled to the meeting location with ALKAHLA.

26.     At approximately 12:30 p.m. that same day, CS2 placed a consensually recorded telephone call to ALKAHLA at cellular telephone number

xxx-xxx-7888. CS2 and ALKAHLA confirmed the location of their meeting as a coffee shop near the intersection of LaGrange Road and 55th Street. CS2 stated that he/she would give ALKAHLA the "order and the kinds [he/she] want [end]."

27.     At approximately 12:57 p.m., agents observed ALKAHLA arrive at the parking lot of a coffee shop located on the 5500 block of South LaGrange Road in Countryside, Illinois. Once there, ALKAHLA met with CS1 and CS2. The meeting was audio-recorded.

28.     CS2 stated that some merchandise is good and some is bad, and that some suppliers mix different types of merchandise. CS2 stated that he/she needed to know the type of merchandise beforehand. CS2 stated: "I want $3500 square," which agents understand to mean an order of an amount of synthetic drugs equal to approximately $3,500. ALKAHLA responded "ok." Later in the conversation, CS2 referred to "5,000," and according to CS2, he/she ordered $5,000 of synthetic drugs. According to CS2, ALKAHLA advised him/her that he would sell bags of synthetic drugs for $7.50 per 10-gram bag and $4.00 per 4-gram bag. CS2 told ALKAHLA that the next order will be bigger, and mentioned "$100,000." ALKAHLA asked CS2 to make the current deal "seven [i.e., $7,000]," encouraging CS2 to purchase $7,000 of synthetic drugs, "because [ALKAHLA] want[s] to be a partner in it." According to CS2, CS2 declined to purchase a larger amount at that time.

*Consensually-recorded Telephone Calls with ALKAHLA*
*On April 29, 2013 and April 30, 2013*

29.     On April 29, 2013, at approximately 7:17 p.m., CS2 received a consensually-recorded telephone call from ALKAHALA at telephone number xxx-xxx-7888.   ALKAHLA informed CS2 that the shipment would arrive on Wednesday, that is, May 1, 2013.  CS2 asked ALKAHLA what time the truck would arrive, and ALKAHLA stated that he did not know but would confirm that time. ALKAHLA informed CS2 that he would call CS2 the following day to confirm the arrival time of the shipment.   ALKAHLA advised that the "merchandise" was already on the truck, and so it was guaranteed to arrive by May 1, 2013.  CS2 asked if he/she needed a van, and ALKAHLA advised that a car was "good enough."

30.     On April 30, 2013, at approximately 7:06 p.m., CS2 placed a consensually-recorded phone call to ALKAHALA at telephone number xxx-xxx-7888.  CS2 asked AKAHLA if he believed that the shipment would be in by 1:00 p.m. the following day. ALKAHLA responded, "Yeah, yeah, God willing."  CS2 and ALKAHLA agreed to meet in the area of Harlem Avenue and Cermak Avenue at approximately 1:00 p.m. the next day. CS2 advised that he/she wished to "talk a little about getting the second deal going" and asked for prices.   CS2 asked ALKAHLA to get him/her "prices for over here versus the price for over there," referring to the difference in price if CS2 received a large shipment delivered to the Northern District of Illinois (i.e., "here"), or if CS2 picked up the shipment in Florida himself/herself (i.e., "there").

10

*May 1, 2013, Meeting between ALKAHLA, CS1, and CS2*

31.     On May 1, 2013, at approximately 12:11 p.m., CS2 received a consensually-recorded phone call from ALKAHALA from telephone number xxx-xxx-7888. ALKAHLA and CS2 confirmed their "appointment at 1:00" and agreed to meet in a parking lot of a grocery store located near 25th street and Harlem Avenue in North Riverside, Illinois.

32.     On May 1, 2013, at approximately 12:40 p.m., agents met with CS1 and CS2 at a predetermined staging location. Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found. Agents provided CS2 with $5,000 in United States currency in a white envelope. Agents surveilled the CSs as they traveled to the meeting location with ALKAHLA.

33.     At approximately 1:00 p.m., agents observed ALKAHLA arrive at the location where he and the CSs previously agreed to meet. At approximately 1:12 p.m., CS1 and CS2 arrived and drove past ALKAHLA, waving for him (ALKAHLA) to follow them. ALKAHLA followed the CSs and parked beside CS2's vehicle on the west side of the grocery store. The meeting was audio-recorded.

34.     CS2 advised ALKAHLA that he wanted the same merchandise for the second deal, and that he wanted to place a "huge order," approximately $200,000 to $300,000 of synthetic drugs. CS2 stated, "Here's 5,000," and encouraged ALKAHLA to count it. ALKAHLA responded, "All right, then." According to CS2, ALKAHLA did not count the money there because he trusted CS2. CS2 asked about the discounted price for the proposed second deal, and

ALKAHLA responded he would provide a discount of $.50 per package.

35.     During the meeting, agents observed ALKAHLA open the passenger side rear door of his car. Agents observed two brown cardboard boxes on the seat. Agents observed CS1 reach into ALKAHLA's car and remove the larger of the two boxes. Agents observed ALKAHLA reach into his car and remove the smaller of the two boxes. CS1 and ALKAHLA placed the boxes into the trunk of CS2's car. At approximately 1:15 p.m., agents observed CS2 hand to ALKAHLA the white envelope containing $5,000.

36.     Agents followed CS2's car back to a predetermined meeting location, at which time agents seized and opened both cardboard boxes received from ALKAHLA. When agents opened the boxes, agents discovered thousands of packages of suspect synthetic drugs, ranging in weight from three grams to twelve grams. In total, the suspect synthetic drugs weighed approximately 12.2 kilograms (gross weight). Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found.

37.     On the same day at approximately 3:30 p.m., CS2 placed a consensually-recorded phone call to ALKAHALA at telephone number xxx-xxx-7888. CS2 stated that he wanted to make sure that ALKAHLA counted the money and that everything was good. ALKAHLA responded affirmatively.

38.     The DEA laboratory determined that the suspect synthetic drug purchased from ALKAHLA on May 1, 2013 contained an approximate total net weight of 5,226 grams of XLR 11, which was then a controlled substance analogue,

as well as PB-22 and/or 5F-PB-22.

*May 16, 2013, Meeting Between ALKAHLA, CS1, and CS2*

39.      On or about May 14, 2013, at approximately 5:05 p.m., CS2 received a consensually-recorded telephone call from ALKAHLA from telephone number xxx-xxx-7888. ALKAHLA stated that he wanted to meet with CS2 in person before ALKAHLA left for Florida. At approximately 5:20 p.m. that same day, CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. CS2 and ALKAHLA agreed to meet on May 16, 2013, at 1:00 p.m., at a coffee shop located on the 5500 block of South La Grange Road, in Countryside, Illinois.

40.      On May 16, 2013, at approximately 12:45 p.m., agents met with CS1 and CS2 at a predetermined location. Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found. Agents surveilled the CSs as they traveled to the meeting location with ALKAHLA.

41.      At approximately 12:56 p.m., agents observed CS1 and CS2 arrive at the coffee shop, park, and walk inside. At approximately 1:05 p.m., agents observed ALKAHLA arrive, driving a silver Honda sedan bearing the same Indiana dealer registration that agents previously observed on ALKAHLA's silver Toyota Tundra. ALKAHLA parked and walked inside the coffee shop. The meeting was audio-recorded.

42.         ALKAHLA explained how he planned to fly to Florida on Sunday, May 19, 2013. CS2 advised ALKAHLA that he liked the "merchandise" from last time. CS2 then stated that he wanted to stay with the same merchandise.

43.         ALKAHLA and CS2 discussed the size of the order and negotiated the price. CS2 stated to ALKAHLA, "What I want is a big order. Are you going to be able to handle it?" CS2 further explained: "I want an order worth around a quarter million dollars. Can they do that?" ALKAHLA responded, "Of course." CS2 asked ALKAHLA what the price would be, and CS2 asked for a "good price." ALKAHLA responded: "You know, I push it so I can give you a good price. Because I want you... Right now, I mean, a big order is something I can do. I'll take 25 cents off so you get a big order of this stuff." Agents understand ALKAHLA's statement to refer to a discount of $.25 per package of synthetic drugs because CS2 was placing such a large order. CS2 asked ALKAHLA for the prices per package of synthetic drugs, for example asking, "It's three and a half for what size," referring to what size package of suspect synthetic drugs he/she would receive for $3.50. ALKAHLA responded, "Four," referring to a four-gram package of suspect synthetic drugs. ALKAHLA further explained, "Ten is going to be for seven," referring to ten-gram package of suspect synthetic drugs for $7. CS2 and ALKAHLA then discussed the quality of the synthetic drugs. CS2 told ALKAHLA that "[CS1] tried it and got high."

44.         ALKAHLA and CS2 discussed the logistics of the pending purchase of synthetic drugs. CS2 asked ALKAHLA, "You want cash I assume?"

14

ALKAHLA answered, "Of course." CS2 told ALKAHLA, "I'll get it to you anyway you want." ALKAHLA stated, "Well I may have you give me some here and the rest in the old country," which agents understand to mean partial payment in cash and the remainder being sent to an account overseas via bank wire transfer. CS2 asked, "Will they come to you by truck or something like that? If you put it in a truck, then you can give me the truck and I'll give you the money immediately. I'll get it to you in the van over there. . . . I'll show you right now."

45.         Agents observed CS1, CS2, and ALKAHLA exit the coffee shop and enter CS2's vehicle. While inside the vehicle, CS2 opened a hidden compartment displaying where ALKAHLA would find the payment for the synthetic drugs. ALKAHLA explained where the load of synthetic drugs would be, "We'll put it in … in storage and that's it. We're going to bring a truck and they'll unload them." CS2 responded, "So I'll come to the storage and see it in the storage." ALKAHLA responded, "Yeah. Yeah." After reviewing the logistics of the deal again, ALKAHLA stated, "Your order is going to be two to three days." At approximately 1:28 p.m., agents observed ALKAHLA exit CS2's car, and enter his car and depart.

46.         Agents met with CS1 and CS2 at a predetermined meeting location. Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found.

*Additional Communications between ALKAHLA and CS2 regarding synthetic cannabinoid transaction*

47.         From on or about May 19, 2013 through on or about May 21, 2013, CS2 had a series of consensually-recorded telephone calls with ALKAHLA.

48.     On May 19, 2013, at approximately 10:50 p.m., CS2 received a call from ALKAHLA. During the conversation, ALKAHLA stated that he arrived in Florida on Friday (i.e., May 17, 2013) and the shipment would be ready in four or five days. ALKAHLA stated, "[b]y the weekend everything will be good to go."

49.     On or about May 21, 2013, at approximately 3:41 p.m., CS1 received a text message from ALKAHLA at telephone number xxx-xxx-7888 with a photograph attached. The image contained what appeared to be several hundred packages of suspect synthetic drugs packaged inside large clear plastic bags. At approximately 3:42 p.m., CS1 received another text message from ALKAHLA at telephone number xxx-xxx-7888 with a photograph attached. The image contained what appeared to be several hundred packages of suspect synthetic drugs inside a red plastic bin.

50.     On May 21, 2013, at approximately 1:06 p.m., CS2 received a consensually-recorded telephone call from ALKAHLA. During the conversation, ALKAHLA asked CS2 "to secure 50 for me in the old country down there," which agents understand to mean CS2 taking $50,000 of the purchase price and sending it to ALKAHLA's account via bank wire transfer. CS2 agreed and asked if the merchandise was coming with ALKAHLA. ALKAHLA answered, "No, a day or two after my arrival."

51.     On May 22, 2013, at approximately 11:25 a.m., CS1 received a text message from ALKAHLA at telephone number xxx-xxx-7888 with a photograph attached. The image contained what appeared to be several thousand packages of

suspect synthetic drugs inside four large, black (contractor-type) garbage bags. The tops of the bags were open in the photograph.

52.       On May 23, 2013, at approximately 3:34 p.m., CS2 received a consensually-recorded telephone call from ALKAHLA. CS2 asked ALKAHLA when the order would arrive. ALKAHLA replied, "Most likely on Monday, because according to the trucking company it leaves tomorrow." ALKAHLA stated that it could take two to three days. ALKAHLA also instructed CS2 to "[b]ring the truck so we can put them inside."

53.       On or about Sunday, May 26, 2013, at approximately 9:49 p.m., CS2 received a consensually-recorded telephone call from ALKAHLA at telephone number xxx-xxx-7888. During the conversation, ALKAHLA informed CS2 to expect the suspect synthetic drugs the next day. CS2 explained that he/she might not be back in town until Tuesday.

54.       On Monday, May 27, 2013, at approximately 1:36 p.m., CS2 received a consensually-recorded telephone call from ALKAHLA at telephone number xxx-xxx-7888. During the call, CS2 asked ALKAHLA if the shipment of suspect synthetic drugs arrived. ALKAHLA responded affirmatively, and CS2 explained that he/she was still out of town and they discussed meeting the following day to complete the deal.

55.       On or about Tuesday, May 28, 2013, at approximately 10:49 a.m., CS2 placed a consensually-recorded telephone call to ALKAHLA at telephone number xxx-xxx-7888. During the call, CS2 explained that he/she could not

complete the deal before 9:00 a.m. the next day because "[t]he bank can't bring the money." CS2 assured ALKAHLA that he/she would be ready after 9:00 a.m., and CS2 agreed to meet ALKAHLA around 9:30 a.m. wherever he wanted. CS2 asked ALKAHLA what size truck he/she should bring, and ALKAHLA advised, "The normal, the 16," referring to 16-foot truck.

### May 28, 2013, Seizure of Approximately 545 Kilograms of Substances Containing XLR 11, a Schedule I Controlled Substance

56. On or about May 27, 2013, at approximately 10:03 a.m., law enforcement, pursuant to a state court order, electronically located ALKAHLA's cellular telephone to be at a storage facility located on the 3900 block of North River Road in Schiller Park, Illinois. At approximately 1:49 p.m., law enforcement again electronically located ALKAHLA's cellular telephone to be at the approximate same location.

57. On or about May 28, 2013, at approximately 9:30 a.m., law enforcement served an administrative subpoena on the aforementioned storage facility. The storage facility's records indicated that storage unit number 210 was rented by "Hisham ALKAHLA" on or about May 27, 2013. The manager advised law enforcement that ALKAHLA has rented other units at a nearby Public Storage facilities in the past. The manager advised law enforcement that on or about May 27, 2013, at approximately 10:00 a.m., ALKAHLA arrived at the storage facility with a blue mini-van, two Suburban-type SUVs, and a fourth vehicle.

58. At approximately 9:00 p.m. on or about May 28, 2013, the government covertly executed a search warrant on public storage unit #210 and

seized approximately 545 kilograms of suspect synthetic drugs, pursuant to Federal Rule of Criminal Procedure 41. Specifically, agents entered Public Storage and located unit #210. Agents cut the lock from the unit and opened it. Inside, agents observed several large black plastic bags containing small packages of suspect synthetic drugs. The storage unit did not appear to contain anything else. Agents removed the suspect synthetic drugs from the storage unit. Agents placed a new lock on the storage unit, which appeared similar to the lock that agents had just previously removed.

59.     DEA laboratory determined that the suspect synthetic drug seized from ALKAHLA's storage unit on May 28, 2013 contained XLR 11, a Schedule I Controlled Substance.[4]

*May 29, 2013, Meeting between ALKAHLA and CS2*

60.     On or about Wednesday, May 29, 2013, at approximately 8:30 a.m., agents met with CS1 and CS2 at a predetermined location. Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found. Agents surveilled the CS2 as they traveled to the meeting location with ALKAHLA.

---

[4] Law enforcement submitted a portion of the suspect synthetic cannabinoid seized from ALKAHLA on May 28, 2013, to the DEA laboratory. All of the packages were separated by brand, making each brand a separate exhibit. Agents submitted representative samples of the exhibits to the DEA laboratory for analysis. If an exhibit was composed of more than one hundred packages of a particular brand, the DEA laboratory randomly selected a representative sample of approximately twenty-nine packages of each brand for analysis. If an exhibit was composed of fewer than one hundred packages, all of the packages were submitted to the DEA laboratory for testing. The DEA laboratory then conducted analysis on up to twenty-nine packages of the substance unless there were fewer than twenty-nine packages, in which case all of the packages were analyzed. This is a common analysis procedure conducted by the DEA laboratory referred to as representative sampling.

61.          On or about May 29, 2013 at approximately 9:23 a.m., CS2 received a consensually-recorded telephone call from ALKAHLA. During the call, ALKAHLA and CS2 agreed to meet him at a coffee shop where they had previously met. ALKAHLA asked if CS1 was coming; CS2 responded that CS1 would wait in the truck in the area "to make sure the merchandise is there." CS2 explained that if the deal went properly, then CS1 would then join them. ALKAHLA responded that he understood. CS2 informed ALKAHLA that he/she will see ALKAHLA in about 30 minutes.

62.          At approximately 9:32 a.m., CS1 received a consensually-recorded telephone call from ALKAHLA. During the conversation, ALKAHLA asked CS1 if they (CSs) were on their way yet, and CS1 responded affirmatively.

63.          At approximately 9:48 a.m., agents observed CS2 arrive at the agreed meeting location. At approximately 9:53 a.m., agents observed ALKAHLA arrive at the same coffee shop, driving a blue minivan. CS2 entered the passenger seat of the minivan. ALKAHLA and CS2 drove away together. The subsequent in-person meetings and interactions between ALKAHLA and CS2 on May 29, 2013, were audio-recorded.

64.          During the drive and amid social conversation, ALKAHLA asked CS2 if he/she had the money with him, and CS2 responded affirmatively. ALKAHLA later asked how much money CS2 brought, inquiring, "You brought 200, right," referring to $200,000. CS2 inquired whether the shipment was the "same

mix" as the last one, referring to the synthetic drugs sold by ALKAHLA to CS2 on or about May 1, 2013. ALKAHLA replied: "It's all the same shit."

65.    At approximately 10:00 a.m., law enforcement observed ALKAHLA and CS2 arrive at the "Public Storage" facility located at the 3900 block of North River Road in Schiller Park, Illinois. Law enforcement observed as they entered the gate and drove to storage unit #210. CS2 then asked ALKAHLA whether the storage unit was full or half full with suspect synthetic drugs, and ALKAHLA responded half full. Law enforcement observed as ALKAHLA attempted to open the lock on the storage unit. As ALKAHLA struggled, CS2 inquired whether ALKAHLA had the right unit, and ALKAHLA responded affirmatively. CS2 then asked whether the key was not working and whether ALKAHLA had the correct key, to which ALKAHLA responded affirmatively again. CS2 asked whether ALKAHLA closed the storage unit the day before, and ALKAHLA responded affirmatively.

66.    At approximately 10:04 a.m., law enforcement observed CS2 and ALKAHLA walk away from the storage unit and walk towards the manager's office of the Public Storage facility. ALKAHLA got the assistance of a Public Storage employee who cut the lock off the storage unit. While the lock was being cut off, CS2 walked away and left the area. Law enforcement observed that ALKAHLA did not open the storage unit, but ALKAHLA placed a new lock on the unit. ALKAHLA then entered his vehicle and departed.

67.     At approximately 10:48 a.m., law enforcement observed ALKAHLA meet CS2 back at the Public Storage facility. CS2 explained to ALKAHLA that he/she previously walked away when ALKAHLA enlisted the assistance of the Public Storage employee because CS2 did not want to be present if the employee opened the unit and observed what was inside it. ALKAHLA agreed. CS2 responded, "Nobody knows we are doing anything wrong except you and I."

68.     Law enforcement observed ALKAHLA then open the storage unit. Observing that the storage unit was empty, CS2 asked whether ALKAHLA was sure he had the correct storage unit. ALKAHLA responded affirmatively. CS2 then asked ALKAHLA whether the lock on the storage unit belonged to him, and ALKAHLA again responded affirmatively. CS2 then stated: "That's impossible. So where's the merchandise?" ALKAHLA replied that he did not know.

69.     According to CS2, ALKAHLA reported to the Public Storage facility that his storage unit had been burglarized. At approximately 11:10 a.m., law enforcement observed ALKAHLA and CS2 depart the storage facility.

70.     Shortly thereafter, law enforcement met with CS1 and CS2 at a predetermined meeting location. Agents searched CS1, CS2, and CS2's vehicle for contraband and weapons, none of which was found.

*ALKAHLA's filing of a false police report and insurance claim*

71.     On or about May 29, 2013, ALKAHLA traveled to the Schiller Park Police Department and filed a police report. Agents acquired a copy of the police report, in which ALKAHLA claimed that the storage unit contained property

for a "Dollar Store," including miscellaneous clothing, papers, and "Dollar Store" items. ALKAHLA alleged that the property was valued at $4,710.

72.        Federal agents subsequently spoke with a representative of Willis Insurance, who advised that ALKAHLA filed an insurance claim for the alleged stolen items from his storage unit.

## CONCLUSION

73.        Based on the foregoing, there is probable cause to believe that, on or about May 28, 2013, HISHAM ALKAHLA possessed with intent to distribute a controlled substance.

FURTHER AFFIANT SAYETH NOT.

LEO HAWKINS
Special Agent
Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on February 3, 2014.

MARIA VALDEZ
United States Magistrate Judge